# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| AHERN RENTALS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:20-cv-00333-JRG |
| | § | |
| EQUIPMENTSHARE.COM, INC., | § | |
| | § | |
| *Defendant*. | § | |

## CLAIM CONSTRUCTION OPINION AND ORDER

Before the Court is the opening claim construction brief of Plaintiff Ahern Rentals, Inc. (Dkt. No. 59, filed on July 17, 2021), Defendant EquipmentShare.com, Inc.'s response (Dkt. No. 63, filed on July 30, 2021), and Plaintiff's reply (Dkt. No. 64, filed on August 6, 2021).

This case concerns U.S. Pat. No. 9,193,330 ("'330 Patent"), which "relates to a method and a system for controlling and monitoring operation of a device." '330 Patent at 1:16–17. Although the patent often refers to operation of a general "device," *see, e.g.*, *id.* at 1:58–2:29, the Background of the Invention concerns vehicles and construction equipment, *id.* at 1:26–44. Ahern alleges EquipmentShare infringes the '330 Patent by providing a telematics system for tracking and sharing construction vehicles. Dkt. No. 2 ¶ 19.

The parties dispute the scope of seven claim terms and phrases of the '330 Patent. The Court held a hearing on these claim construction issues on September 9, 2021 (Dkt. No. 83). Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

## I.      BACKGROUND

The '330 Patent describes common problems with exerting control over rented equipment when use of the equipment is not yet, or no longer, authorized by the owner. *See* '330 Patent, *Background of Invention*. Because the owner might deliver the equipment to the job site a day or two before the rental period, and remove the equipment from the job site a day or two after the rental period, renters might use the equipment outside the window of contractually authorized use. *Id.*

To address this, the patent describes a system with a keyless start arrangement connected to the equipment, a processor connected to the keyless start arrangement, and a remote management source (e.g., a computer or mobile phone) that communicates with the processor. *See* '330 Patent, *Abstract*. When an operator enters an access code into, for example, a keypad connected to the processor, the processor compares the access code with an authorization code received from the remote management source and decides whether to authorize operation of the equipment. *See generally id.* at 1:48–2:24. Additionally, the system can lock out operation of the machine under certain conditions, such as if the time for authorized operation has expired, *id.* at 6:28–32, the operator enters a certain number of access codes that do not match the authorization code, *id.* at 6:35–39, or if someone tampers with the machine, *id.* at 6:52–54.

The patent has two independent claims, both of which are at issue. Claim 1 recites:

[a] method of controlling and monitoring operation of a rental machine having a keyless start arrangement configured to activate the machine, the method comprising:

communicating an authorization code via a remote management source to a processor having a memory, wherein the processor regulates operation of the machine and is operatively connected to the keyless start arrangement configured to activate the machine;

> storing the authorization code within the processor memory;
>
> detecting by the processor an entry of an access code made via a selective input;
>
> assessing whether the entered access code matches the authorization code; authorizing operation of the machine if the entered access code matches the authorization code;
>
> denying authorized operation of the machine if the entered access code does not match the authorization code; and
>
> locking out operation of the machine if the processor detects that the access code was disabled upon completion of the authorized operation of the machine and logging in the actual duration of time the machine was in use;
>
> wherein said authorizing operation of the machine includes starting the machine via the remote management source.

*Id.* at 6:10–34. Claim 11 recites a system having a keyless start arrangement, a processor, and a remote management source configured to perform these same steps. *Id.* at 7:15–43.

## II.   LEGAL STANDARDS

### A.   Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the

prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

### B.      The Level of Ordinary Skill in the Art

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party proffers a specific level of ordinary skill in the art. Accordingly, the parties concede the Court need not resolve the level of ordinary skill to resolve their disputes about the terms.

## III.      THE DISPUTED TERMS

### A.      locking out operation of the machine (cls. 1, 2, 8, 10); lock out operation of the machine (cls. 11, 12)

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | not allowing any user to access and operate the machine |

Claim 1 recites "locking out operation of the machine if the processor detects that the access code was disabled upon completion of the authorized operation of the machine." '330 Patent at 6:28–29. Similarly, Claim 2 recites "locking out operation of the machine if a predetermined number of consecutive access code entries does not match the authorization code via one of the processor and the remote management source." *Id.* at 6:35–39; *see also id.* at 6:52–54 (locking out

the machine "upon detection of [an] attempt to hotwire the machine"). Claims 11, 12, and 16 include similar limitations.

EquipmentShare alleges the meaning of "locking out" is unclear given Claim 1's limitation of "denying authorized operation of the machine if the entered access code does not match the authorization code." *See* Dkt. No. 63 at 28. According to EquipmentShare, "[i]f the [locking out] term could be read to simply encompass denying a user the ability to operate the machine until entry of a valid access code, then the entire concept of 'locking out' would be read out of the claims . . . ." *Id.* at 23. It resolves this apparent problem by construing the disputed phrase, unlike the "denying authorized operation" limitation, to require preventing *any* user from both operating *and accessing*[1] the machine. To support its construction, EquipmentShare relies on the patent's description of a software algorithm that, under certain conditions, locks out all users and no longer permits access to and operation of the machine. *Id.* (citing '330 Patent at 5:27–36).

Ahern criticizes EquipmentShare's approach as improperly importing limitations from the specification into the claims. The passage on which EquipmentShare relies, says Ahern, is limited to a specific embodiment. Dkt. No. 64 at 1. Moreover, Ahern claims EquipmentShare's position is inconsistent with its IPR petition, in which it suggested "locking out" prevented a user from accessing *or* operating the equipment. *Id.*

### 1.    Whether locking out "operation" requires locking out "access"

The written description provides some guidance on the term's meaning:

If [a] Lockout Flag is set, then the algorithm transits to a Lockout Mode in the frame 68, where all users are locked out and are no longer permitted to access and operate

---

[1] By "access," EquipmentShare means the opportunity to enter an access code. Dkt. No. 83 at 11:7–11.

construction machine 56 until the Lockout Flag . . . has been cleared by the administrator.

'330 Patent at 5:31–36 (referring to the steps shown in Fig. 4).

The idea of controlling "operation" (as opposed to "access") is conspicuous throughout the patent. *See, e.g.*, '330 Patent, *Title* ("Method and a System for Controlling and Monitoring *Operation*" (emphasis added)); *id.*, *Abstract* (referring to regulating and authorizing operation, but not to access); *id.* at 1:16–17 ("The invention relates to a method and a system for controlling and monitoring operation of a device."). Indeed, some embodiments are described broadly as relating to operation, but not access. *See id.* at 1:48–49 ("A first embodiment is a method of controlling and monitoring *operation* of a device." (emphasis added)); *id.* at 2:14–15 ("A second embodiment is a system of controlling and monitoring *operation* of a device." (emphasis added)). Moreover, throughout the patent, authorizing or denying operation happens as result of—and therefore *after*—attempted access. *See, e.g.*, '330 Patent, *Abstract* (describing the method as "authorizing operation of the device if the access code matches the authorization code"); *id.* Fig.2 (showing authorization of operation (step 43) occurring after entry of an access code at the keypad (step 40)).

The claims do not reference "accessing" the machine. Claim 1, for example, requires "locking out *operation* of the machine," but is silent as to access. *Id.* at 6:28 (emphasis added); *see also id.* at 7:39 (reciting a remote management source configured to "lock out operation of the machine"). Although other claims require "locking out the machine" without reference to *either* access or operation, each of these depends from a claim that recites "locking out operation." *See, e.g.*, *id.* at 6:52; *id.* at 8:19–20.

EquipmentShare's position on this aspect of its construction is not persuasive in light of

the specification and claim language. The passage on which EquipmentShare relies is the only potential reference to locking out access in the patent, and its connection between "locking out" and "access" is tenuous at best. That users may be "locked out and are no longer permitted to access and operate [a] machine" in one embodiment is not sufficiently definitional to expand the meaning of "operation" to "operation *and access*" when, as here, the applicant clearly recognized a distinction between those words. Moreover, adopting EquipmentShare's construction would result in the only instance of "operation" encompassing not just the functioning of the device, but also entry of an access code. Thus, EquipmentShare's construction does not align with the '330 Patent's use of "operation" throughout the disclosure, and this aspect of EquipmentShare's construction is rejected.

### 2.    Whether locking out operation requires locking out all users

EquipmentShare's response brief does not address this aspect of its proposed construction in depth. Its construction, however, "flows directly" from the patent's description of "all users [being] locked out" in one embodiment. Dkt. No. 63 at 23 (citing '330 Patent at 5:27–36). During the hearing, however, EquipmentShare argued that "locking out operation" applies broadly to all users, and that if the applicant intended a narrower scope the claims would have recited as much. *See* Dkt. No. 83 at 21:21–22:5.

But locking out "all users" is the *narrower* interpretation. Under a broader interpretation, for example, one or more users (which includes all users) would be locked out. Regardless, the passage on which EquipmentShare relies relates to a specific software algorithm that locks out "users," whereas the claims recite locking out "operation." The plain and ordinary meaning of the term is therefore less restrictive than EquipmentShare contends.

* * *

The patentee recognized a distinction between "access" and "operation," yet he chose to only recite "operation" in the claims. Adopting EquipmentShare's construction would thus improperly import limitations into the claims and disregard the plain and ordinary meaning of the claim language. Accordingly, the Court rejects EquipmentShare's construction and the notion that "locking out operation" requires locking out "access" and "all users." This term should otherwise be given its plain and ordinary meaning.[2]

**B.      shutting down (cl. 8); shut down (cl. 18)**

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | turning off the machine |

The patent explains that, under certain conditions or circumstances, a machine's owner might want to interrupt its operation. *See* '330 Patent at 4:41–44. To that end, Claim 8 recites "shutting down and locking out operation of the machine . . . when operation of the machine occurs outside [a] predetermined time frame." *Id.* at 6:64–65. Similarly, Claim 18 requires "a remote management source configured to shut down the machine when operation of the machine occurs outside the predetermined time frame." *Id.* at 8:31–33.

The parties disagree on whether the term needs construction. EquipmentShare contends "shutting down" and "shut down" must be construed because the difference between these phrases

---

[2] To a certain extent, the dispute is really about the difference, if any, between "denying authorized operation" and "locking out operation." During the hearing, EquipmentShare questioned "whether Ahern contends that locking out includes simply allowing another code entry attempt and denying authorization if it's an invalid code." Dkt. No. 83 at 11. Ahern then correctly asserted that "locking out operation" is different in scope than "denying authorized operation." *Id.* at 19:22–20:1. "Denying authorized operation" is an instantaneous event without lingering after-effects. Thus, with respect to Claim 1, after entering an access code that does not match the authorization code, an operator could immediately enter a valid access code and be authorized to operate the machine. In contrast, "locking out operation" may require some other occurrence for authorized operation, such as the passage of time, an administrator clearing a flag, '330 Patent Fig.4 (step 68), or entry of an emergency code, *id.* Fig.4 (step 70).

and "locking out" is unclear. Dkt. No. 63 at 25. Construction is particularly necessary, says EquipmentShare, because Ahern asserts some overlap between "shutting down" and "locking out," although EquipmentShare does not explain the extent of this alleged overlap. *Id.* at 26. Ahern, however, accuses EquipmentShare of "just substituting 'shutting down' with 'turning off.'" Dkt. No. 59 at 8. EquipmentShare, says Ahern, "does not identify even an arguable dispute on this term, much less a legitimate reason to rewrite it." Dkt. No. 64 at 3.

As with "locking out," references to the meaning of "shutting down" in the '330 Patent are sparse. Rather, the patent simply specifies the various conditions under which the device or machine is "shut down." In the Summary, for example, the patent describes "remotely shutting down the operation of the device when operation of the device occurs outside the predetermined timeframe." '330 Patent at 2:6–8. Similarly, when describing the preferred embodiments, the patent explains "management source 32 may . . . be adapted to remotely shut down the operation of controlled equipment 12 when such unauthorized operation is detected." *Id.* at 3:52–55; *see also id.* 4:41–44 ("When operation of the construction machine 56 occurs outside the predetermined timeframe, and if interruption of such operation is desired, the host computer 45 may remotely shut down the operation of construction machine 56.").

"Shutting down" is best understood in light of the patent's description of "starting" or "activating" the machine using a keyless start arrangement. The Summary describes the invention generally as having "a keyless start arrangement configured to activate the device." *Id.* at 1:51–54; *see also id.* at 2:15–16; *id.*, *Abstract*. As shown in Fig. 1, the keyless start arrangement is a keyless ignition system that "includes a keypad 16 . . . operatively connected to such various electronically and/or mechanically interconnected devices . . . for starting engine 14[.]" *Id.* at 2:57–62. With respect to Fig. 2, the patent describes "a keyless ignition system 58 mounted on the

construction machine." *Id.* at 4:31–32. A skilled artisan would understand that keyless ignition system is connected to an engine.

Based on the disclosure, a person of ordinary skill would understand that "shutting down" and "starting up" or "activating" are the bookends to operation. In other words, whatever is started by the last limitation of Claim 1 is shut down in Claim 8. The "starting" or "activating" happens by way of the keyless start arrangement, which is inherently connected to a powerplant such as a motor or engine. The claims, however, are not so restrictive as to exclude a motor from the system or method. Accordingly, the Court construes "shutting down" as "turning off the motor or engine" and "shut down" as "turn off the motor or engine."

**C.     remote management source (cls. 1–3, 7–13, 17–20)**

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | management source that is across a physical distance from the machine |

With its construction, EquipmentShare contends "remote" requires physical distance between the management source and the machine. It claims the '330 Patent provides an express definition of this, and that the intrinsic evidence supports its construction. Dkt. No. 63 at 1. Ahern counters that EquipmentShare's construction "invites further ambiguity," such as whether "physically distant" requires some minimal amount of separation. Dkt. No. 58 at 8–9.

These issues were largely resolved during the hearing. Ahern acknowledged that "remote" requires some physical distance. Dkt. No. 83 at 37:20–23. And EquipmentShare agreed that "remote" does not require some minimal amount of separation. *See id.* at 52:4–19 (agreeing that an operator using a "remote management source" in the form of a cell phone while in operating the machine falls within the scope of this limitation). EquipmentShare also agreed with the Court's

preliminary construction of "management source that is across a physical distance from the machine." *Id.* at 48:17–23.

The hearing, however, elicited the true dispute between the parties: whether any part of the remote management source can be on the machine. Ahern contends the "remote" aspect of the term defines how the authorization code is provided rather than the relative position of the entire "management source." Dkt. No. 64 at 5. From Ahern's perspective, the management source is "remote" relative to the processor, but not necessarily the machine. Dkt. No. 83 at 40:17–20. It contends that, although the communication with the processor must be remote, some components of the management source could be local. *Id.* at 40:6–8.

But this is not how a skilled artisan would understand this term. The patent consistently shows the disclosed management sources, in their entirety, as physically distant from the machine. *See* '330 Patent Fig.1 (item 32), Fig.2 (items 45, 54). The patent explains "[t]he contemplated *management source* 32 may be [any] device capable of providing *remote* communication." *Id.* at 3:18–21 (emphasis added). This shows "remote" modifies "management source" as a whole, and not just the nature of the "communication" with the processor. Moreover, the Summary of the Invention confirms this understanding by explaining "communicating an authorization code may be accomplished remotely *relative to the device*" rather than just the processor. *Id.* at 1:61–63 (emphasis added).

The Court therefore rejects Ahern's contention that "remote" refers only to how the authorization code is provided to the processor. The management source is not remote relative to just the processor, but to the machine. In other words, no part of the "remote management source" can be on the machine. With that in mind, the Court construes "remote management source" as "a management source that is across a physical distance from the machine."

### D.    processor (cls. 1–3, 7–13, 17–20)

| Ahern's Construction | EquipmentShare's Construction |
| --- | --- |
| no construction necessary / plain and ordinary meaning | Each reference to "the processor" refers to the same processor as the antecedent "a processor" |

Ahern contends "processor" as used in the claims is broad enough to encompass "one or more processors." Dkt. No. 59 at 10 (citing cases). Specifically, Ahern contends that "[b]ecause the specification explicitly discloses the use of multiple separate and distinct processors across different claimed elements, this term should not be limited to require the same number and identity of processors to perform each step." Dkt. No. 64 at 6. EquipmentShare counters that the only "common sense, fair reading" of "processor" as used in the claims requires that each reference to "the processor" be the same processor previously referred to in the claims. Dkt. No. 63 at 12–13.

EquipmentShare is correct. Each claim requires "a processor having a memory and operatively connected to [a] keyless start arrangement." '330 Patent at 7:19–20; *see also id.* at 6:14. Further, the claims require that the processer be configured to regulate operation of the engine, receive and store an authorization code, and make certain assessments regarding the access and authorization codes. *Id.* at 7:24–30. To hold, as Ahern asks, that the claimed steps could be performed by any number of unidentified processors conflicts with the ordinary meaning of the claim language.

Ahern's argument relies on *Baldwin Graphics Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008), but that case addresses a different issue. In *Baldwin*, the Federal Circuit reversed the trial court's ruling that the asserted claims' recitation of "a presoaked fabric roll" meant *exactly one* fabric roll having the claimed features. *Baldwin*, 512 F.3d at 1342–43. The trial court wrongly held the disputed claim to be closed-ended despite its use of the open-ended transition word

"comprising." *Id.* Here, EquipmentShare does not allege that the claims are closed-ended.[3]

Ahern's position stems in part from the patent's disclosure that "any wireless communication provided by cell modem 34 shown in FIG. 1, is controlled by the processor 18, or a processor (not shown) of the cell modem." Dkt. No. 59 at 10 (citing '330 Patent at 5:53–55). This unshown processor of the cell modem is the basis for Ahern's belief that the specification explicitly discloses the use of multiple processors across different claimed elements. According to Ahern, EquipmentShare's construction would exclude Claims 4 and 7—both of which recite communication between "the processor" and the "remote management source"—from covering that embodiment. Dkt. No. 64 at 6; *see also* Dkt. No. 83 at 61:4–6.

Ahern's reasoning is flawed. For one, even if Ahern's contention about the modem's processor performing a claimed step is correct, "[i]t is not necessary that each claim read on every embodiment," *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010). Regardless, as EquipmentShare correctly recognizes, the modem is simply an intermediary between the processor 18 and the remote management source 32. Thus, a skilled artisan would not understand the cell modem as performing any steps of Claims 4 or 7.[4]

---

[3] In other words, EquipmentShare does not contend the claims would not cover a system with multiple processors, each of which has the recited characteristics or performs the recited steps, simply because the claims recite only a single processor.

[4] Ahern's position might have more weight if no single disclosed processor performed each of Claim 4's and Claim 7's steps, but the specification discloses that processor 18 does. *See id.* at 3:1–2 ("Controlled equipment 12 further includes a processor 18 having a memory 20"); *id.* at 3:21–25 ("The processor 18 . . . is adapted for regulating operation of the controlled equipment 12, . . . storing the authorization code within the memory 20, and receiving an access code entered via a selective input at keypad 16."); *id.* at 3:64–4:2 ("The access code is then received by the processor 18 [and] compared to the authorization code."); *id.* at 4:2–13 ("If the access code matches the stored authorization code, the operation of the controlled equipment 12 is authorized . . . . If the access code received by processor 18 does not match the stored authorization code in frame 42, . . . operation of controlled equipment is denied."); *id.* at 3:33–35 ("Processor 18 may be additionally adapted to record and store usage information, including operational hours by each authorized user"); *id.* at 5:3–16 (describing, as recited in Claim 4, the software algorithm as implemented by the processor 18, which "checks if a Hotwire condition has been detected by the processor. In case

EquipmentShare correctly states that a processor of an accused device literally meets the "processor" limitation of a claim if it has all of the recited characteristics and performs all the recited steps. Each reference to "the processor" within the claims refers to the same processor as the antecedent "a processor." With that in mind, the Court gives this term its plain and ordinary meaning.

### E.    rental machine (cls. 1, 11)

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | machine offered for use for a limited time without purchase |

The parties dispute two issues concerning this term, which only appears in preambles. First, they dispute whether the preambles are limiting. Second, EquipmentShare contends the term must be construed, whereas Ahern contends "rental machine" requires no further construction.

### 1.    Whether the preamble is limiting

"Whether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)). "Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim." *Id.* Similarly, "[i]f the body of the claim 'sets out the complete invention,' the preamble is not ordinarily treated as limiting the scope of the claim." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002).

---

of the hotwire attempt, the algorithm . . . provides notification to the host computer 40"); *id.* at 3:46–49 (explaining, as recited in Claim 7, "[p]rocessor 18 may be additionally adapted to detect unauthorized operation of controlled equipment 12 when operation of the controlled equipment occurs outside the predetermined timeframe. Additionally, processor 18 may be adapted to communicate to management source 32 via cell modem 34 a signal indicative of the detected unauthorized operation.").

But the preamble is limiting if it recites essential structure that is important to the invention or necessary to give meaning to the claim. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305–06 (Fed. Cir. 2005), *cert. denied,* 546 U.S. 1157 (2006). That is, if the claim drafter "chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined . . . is the one the patent protects." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). Moreover, when the limitations in the body "rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

Here, the structure of the claims shows the preamble is limiting with respect to "rental machine." The applicant chose to use both the preamble and the body to define the claimed subject matter. Specifically, the patentee chose to recite "a *rental* machine" in each preamble rather than "a device" or simply "a machine," even though the patent elsewhere refers to controlling operation of a general device. "The machine" in the body clearly refers back to, and derives antecedent basis from, the "rental machine" of the preamble, and the phrase does not simply appear in a statement of purpose or intended use.

Ahern presumes that "[w]hether a machine is a 'rental' has no bearing on its structure," Dkt. No. 64 at 7, but it does not support that presumption with intrinsic evidence. And even if that presumption is correct, the recited "machine" is nonetheless a critical part of the steps in both Claim 1 and Claim 11, which regulate its operation.

Claim construction "must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Innova/Pure Water, Inc. v. Safari*

*Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)) (alteration in original). Here, the applicant apprised the public his invention pertains to "rental machines." To hold otherwise would both render "rental" superfluous and defeat the public notice function of the patent. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) (explaining "claims serve the important notice function of informing the public that anyone who makes, uses, or sells the claimed invention infringes the patent").

### 2.      The proper construction of "rental machine"

EquipmentShare urges its construction for three reasons. First, it claims the concept of a "limited time" is inherent in the claims themselves. Dkt. No. 63 at 20–21. Second, the '330 Patent repeatedly defines "rental machine" using language aligning with its construction. *Id.* at 21. Third, the applicant's remarks during prosecution support the construction. *Id.* at 21–22.

Ahern claims EquipmentShare's construction is inconsistent with the '330 Patent and improperly limits the scope of the term. Dkt. No. 59 at 13. More specifically, Ahern contends

> nothing in the '330 Patent . . . suggests a "rental machine" cannot be offered for purchase in addition [to] being offered for rent. Nor does [the] disclosure . . . suggest a "rental machine" must be offered for use for a limited time, as opposed to one that is open-ended or extendable . . . . [T]he plain and ordinary meaning of "rental machine" is easily understood by a jury.

*Id.* at 13–14.

To the extent there is a dispute over scope, it centers on the "without purchase" aspect of EquipmentShare's construction. During the hearing, EquipmentShare addressed Ahern's concerns by acknowledging that a rental machine could be simultaneously available for purchase during the

rental period. Dkt. No. 83 at 78:14–18. Similarly, any option to purchase as part of a rental agreement is not determinative of whether the subject equipment falls within the scope of this term.

With this guidance in mind, "rental machine" is well-understood by a layperson, *see* Dkt. No. 63 at 21 (recognizing "the word 'rental' may be generally familiar to jurors"), and this term will be afforded its plain and ordinary meaning. Any question of whether a particular machine is a "rental machine" is a fact question for the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (recognizing "that district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims (emphasis in original)); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1349 (Fed. Cir. 2001) (rejecting the defendants' argument that the district court improperly refused to construe a claim term and concluding "[t]he issue in dispute was the application of the [recited limitation] in the accused process, a factual question of infringement").

**F.      wherein said authorizing operation of the machine includes starting the machine via the remote management source (cl. 1); wherein the remote management source is additionally configured to: . . . start the machine if the entered access code matches the authorization code (cl. 11)**

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | wherein said authorizing operation of the machine includes the remote management source starting the machine |

This dispute concerns whether these phrases require that the remote management source directly start the machine, or whether it also contemplates some human interaction as part of the starting process. Ahern contends this phrase covers both situations, Dkt. No. 83 at 93:7–15, whereas EquipmentShare asserts only the former is proper.

Both the claims and the written description support EquipmentShare's position. The ordinary meaning of "starting a machine" as used in the claims excludes any situation where the remote management source only enables the machine to be started by someone or something else. Indeed, the inventive concept concerns remotely controlling operation of the device using, among other things, a keyless *start* arrangement. In fact, the written description recognizes there might be unauthorized attempts to start the machine over the wireless network. '330 Patent at 4:35–38. Immediately after explaining the machine can be shut down remotely, the patent explains the machine "may be additionally started by a controlling signal from the host computer 45 or cellular telephone 54 directly." *See id.* at 4:48–52. This discloses more than just enabling the machine for starting by a person, as Ahern contends.

The prosecution history also supports EquipmentShare's construction. As originally filed, Claims 10 and 20 included versions of the disputed phrase. Dkt. No. 63-9 at 10 (reciting, in original Claim 10, "wherein . . . said authorizing operation of the machine includes starting the machine via the remote management source"); *id.* at 13 (reciting, in original Claim 20, "wherein the remote management source is additionally configured to start the machine"). The Patent Office initially rejected these claims as anticipated by U.S. Published Application 2005/0264396 ("Horkavi"). *See* Dkt. No. 59-2 at 6. In response, the applicant argued "Horkavi fails to contemplate that authorizing operation of the machine includes starting the machine via the remote management source." *Id.* at 9.

Horkavi "relates generally . . . to a machine security system having remote access code management." Horkavi at [0001]. It explains that prior-art machine security systems interact with a starter "in response to an identification code associated with [an] electronic key." *Id.* at [0002]–[0003]. The application discloses, among other approaches, an encoded key that can be inserted

into an input device. *Id.* at [0019]. The input device communicates the key code to a controller, which grants or denies access to particular functions of the machine depending on the validity of the code. *Id.* at [0021].

Importantly, Horkavi is a system for managing access codes, not for controlling the machine. Horkavi explains that prior-art systems *permit* operation (as opposed to *control* operation) of the work machine when a code from an electronic key matches a valid access code. *See id.* at [0003] ("These security systems may include electronic keys provided to operators of the work machine that enable operation during a particular time of day or for a particular time duration."). Ultimately, the applicant argued Horkavi does not "suggest that its remote off-board system 14 is configured to start the work machine 12." Dkt. No. 63-2 at 10. This shows the applicant correctly understood Horkavi as requiring the operator to start the machine after the system granted access.

Despite this convincing prosecution history relating to Horkavi, Ahern contends the '330 Patent does not disclose the remote management source being able to start the machine without human intervention, in part because that would be "absurdly dangerous." Dkt. No. 59 at 14; *see also* Dkt. No. 83 at 109:23–110:2. That reasoning, however, presupposes Ahern's interpretation of the claim language is correct. As for safety, Ahern does not explain how the ordinary meaning of claim language changes based on a court's findings about whether the claimed inventions might be "safe."

Based on the plain and ordinary meaning of "starting the machine" considered in light of the specification, EquipmentShare's position is correct and the Court adopts its construction. Accordingly, the Court construes "wherein said authorizing operation of the machine includes starting the machine via the remote management source" in Claim 1 and "wherein the remote

management source is additionally configured to: . . . start the machine if the entered access code matches the authorization code" in Claim 11 as "wherein said authorizing operation of the machine includes the remote management source starting the machine."

### G.      configured to (cls. 1, 11–13, 17–19)

| Ahern's Construction | EquipmentShare's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | actually programmed to |

EquipmentShare spends five pages of its response explaining that "configured to" is not simply "capable of" or "suitable for." Dkt. No. 63 at 26–30. Ahern replies that it has never taken a contrary position. Dkt. No. 64 at 10. Ahern's objection to EquipmentShare's construction concerns excluding mechanical activation of the recited "keyless start arrangement" from the scope of the claims. *Id.* at 10.

Given the parties' and the Court's agreement that "configured to" requires more than just "capable of" or "suitable for," the Court sees no dispute to resolve and therefore gives "configured to" its plain and ordinary meaning.[5] *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and *when necessary* to explain what the patentee covered by the claims . . . ." (emphasis added)); *see also Aventis Pharm. Inc.*, 715 F.3d at 1373 ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

---

[5] During the hearing, EquipmentShare argued its construction would prevent Ahern's experts from lumping together various accused products in their infringement analysis, Dkt. No. 83 at 120:11–12, and "sharpen the disputes for presentation to the jury," *id.* at 120:23–14. This is not a proper basis for construing claims terms. EquipmentShare's concerns are better addressed through cross-examination.

IV.     CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| locking out operation of the machine (cls. 1, 2, 8, 10); lock out operation of the machine (cls. 11, 12) | plain and ordinary meaning |
| shutting down (cl. 8); shut down (cl. 18) | turning off the motor or engine |
| remote management source (cls. 1–3, 7–13, 17–20) | a management source that is across a physical distance from the machine |
| processor (cls. 1–3, 7–13, 17–20) | plain and ordinary meaning |
| rental machine (cls. 1, 11) | The preamble is limiting. plain and ordinary meaning |
| wherein said authorizing operation of the machine includes starting the machine via the remote management source (cl. 1) wherein the remote management source is additionally configured to: . . . start the machine if the entered access code matches the authorization code (cl. 11) | wherein said authorizing operation of the machine includes the remote management source starting the machine |
| configured to (cls. 1, 11–13, 17–19) | plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings in the jury's presence is limited to informing the jury of the positions adopted by the Court.

     **SIGNED this 19th day of October, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE